# WILLIAM SERVISS WAY, CPCU, ARM

## Bill Way Litigation, LLC

RISK AND INSURANCE CONSULTANT

19580 W 59th Drive, Golden, CO  80403-2212

224-475-9979     BillWayToday.com     Bill@BillWayToday.com

I have been asked to review, evaluate and respond to the report of Mr. Leatzow dated January 31, 2018 in the matter of:

Midwest Commercial Funding, LLC, Plaintiff

- against

Cincinnati Specialty Underwriters Insurance Company, CSU Producer Resources, Inc., and Marsh & McLennan Agency, LLC, Defendants

United States District Court for the Eastern District of Wisconsin
Milwaukee Division

Case No: 2:16-cv-0885-LA

CONFIDENTIAL     Page 1 of 17



## Qualifications and Assignment

I am qualified to provide the requested opinions based upon my knowledge, skill, experience, training, and education as reflected in my CV, which is attached hereto and incorporated by reference as **Exhibit A**. Also attached and incorporated by reference as **Exhibit B** is a listing of those cases in which I have testified in a deposition, at trial, or both, during the past four years. The facts and data I considered in forming my opinions include those listed in the document log, attached and incorporated by reference as **Exhibit C**. I may rely upon any listed documents in summary or in support of my opinions at trial, including use as exhibits.

My opinions also are also based upon the totality of my experience, including over 40 years as an insurance loss control professional, underwriter, broker, and internal standards auditor, as described more fully in my CV:

(a) Over 20 years as senior broker, personally responsible for obtaining property insurance for corporations in a variety of industries, including real estate.

(b) More than ten years of active participation in a broker internal audit program and also a broker peer review process. I evaluated account files to determine whether the appropriate broker standard of care and custom and practice were followed by the account team from pre-renewal discussions with the client, through communications with underwriters, all the way to when the policies were issued and later corrected as may have been needed.

During my 15 years as a property insurance underwriter, I was responsible for hundreds of property insurance policies. Beyond my day-to-day work, I studied for and earned the CPCU (Chartered Property Casualty Underwriter) and ARM (Associate in Risk Management) designations. These are the two best known and most respected property-casualty[1] insurance industry designations consisting of a total of thirteen technical, essay-style examinations. The subject matter covered all aspects of P&C insurance, including the responsibilities of underwriters, brokers, and insureds.

The experience and materials enumerated above and in the attached exhibits, the custom and practice at the time, and the relevant standards of care form the bases for my opinions. I am being compensated at my usual rate of $450 per hour. I have not published any books or contributed to any publications in the last ten years.

I've been asked by Quarles & Brady, LLP to review, evaluate and respond to the January 31, 2018 report of Mr. Leatzow in the matter of Midwest Commercial Funding, LLC, Plaintiff, against Cincinnati Specialty Underwriters Insurance Company, CSU Producer Resources, Inc., and Marsh & McLennan Agency, LLC, Defendants.

---

[1] Property-casualty insurance is frequently called "P&C". The term encompasses insurance for both businesses and individuals, and includes property insurance (insurance against fire, flood, and other physical perils) and liability insurance of all kinds. Not included are health and life insurance.

## Nature of the Case

Marsh & McLennan Agency, LLC (MMA) through surplus lines broker[2] CSU Producer Resources, Inc. (CSUPR) placed property coverage for Midwest Commercial Funding, LLC (MCF) with Cincinnati Specialty Underwriters Insurance Company (Cincinnati Specialty) effective April 29, 2015. I understand that this case involves just one of the properties so insured, known as the Farwell Property and located at 1442 N. Farwell Avenue, Milwaukee, Wisconsin. RNTSDU Investments, LLC (RNTSDU) owned the Farwell property subject to a mortgage held by MCF.

From the documents I reviewed, some of the relevant dates are[3]:

- January 6, 2015 – Apparently based on a telephone call with MCF, MAA emailed MCF's property insurer[4] to request that the Farwell location be added to the policy[5].
- January 6, 2015 - Later that day, MMA confirmed to MCF that they had added the Farwell property to MCF's property insurance with a $1,600,000 limit[6].
- March, 2015 (date approximate) – MMA provided MCF with a copy of the "Insurance Submission"[7] which MMA intended to send to potential insurers.
- April 27, 2015 - MCF initiated foreclosure proceedings against RNTSDU as regards the Farwell property.
- April 29, 2015 – Relevant policy[8] incepted.
- October 28, 2015 - Foreclosure granted with a three month redemption period.
- December 19, 2015 – MCF was notified that the gas and electric service had been shut off by WE Energies, presumably due to RNTSDU's failure to pay the bills.
- December 19, 2015 – Later that day, MCF demanded that WE Energies restore gas and electric service to the property, but WE Energies failed to do so.

---

[2] In this report I use the terms "surplus lines broker" and "wholesale broker" interchangeably. Both terms refer to insurance intermediaries with access to markets (insurers) which are not available to retail brokers directly. In custom and practice both terms are used without intending any distinction.

[3] Some of these dates are taken from the January 4, 2017 Amended Complaint.

[4] See MMA00001-03.

[5] At this point in time, Berkley regional Specialty Insurance Company was MCF's insurer.

[6] See MCF001167.

[7] See MCF000560-579.

[8] Cincinnati Specialty Underwriters Insurance Company policy number CSU0069850 (See CSUPro0001-466).

CONFIDENTIAL   Page 3 of 17

- January 9 - 15, 2016 - Water lines froze, and a significant water damage loss resulted (Cincinnati Specialty used 1/18/16 as it's "Loss Date").
- January 19, 2016 – MCF notified MMA of the loss[9].
- January 21, 2016 - MMA submitted its first notice of loss to Cincinnati Specialty[10].
- January 28, 2016 – Foreclosure redemption period ended.
- March 11, 2016 - Cincinnati Specialty's first denial of MCF's claim[11].

Cincinnati Specialty denied the claim based on its allegations that:

- MCF failed to "do [its] best" to protect the property (by maintaining the heat) and
- MCF misrepresented the nature of the its interest in the relevant location, specifically that as of policy inception, MCF was the mortgagee rather than the owner.

## Opinions

My opinions are based on standard insurance industry custom and practice and the resulting standard of care. I do not presume to offer legal opinions.

### OPINION NUMBER ONE:

Mr. Leatzow's erroneous opinion that Mr. Niestrom and MMA violated Wisconsin surplus lines regulations in the procurement of MCF's April 29, 2015 property insurance coverage rests on an incorrect understanding of how surplus lines insurance works. In short, Mr. Niestrom and MMA did not need a surplus lines license for the relevant placement because MMA placed that policy through CSUPR, a licensed surplus lines broker in Wisconsin.

More importantly, and specific to this case, to the extent that the surplus lines "warning" may not have been included in some of MMA's communications with MCF, such error had no impact whatsoever on the wording of the relevant policy, the loss adjustment by Cincinnati Specialty, or any other aspect of this case.

### Basis for Opinion Number 1:

(a) Plaintiff has made various allegations[12] relating to the surplus lines nature of the applicable policy[13]. These allegations seem to stem from plaintiff's fundamental failure to

---

[9] See MMA02263.

[10] See MCF000682.

[11] See MCF000379-84.

[12] Amended Complaint dated 1/4/17: see, for example, the second, third and fourth primary causes of action.

[13] The Cincinnati Specialty Underwriters Insurance Company policy number CSU0069852 effective 4/29/15 to 4/29/16 (See CSUPro0001-466).

CONFIDENTIAL      Page **4** of **17**

understand how in custom and practice, insurance is placed with surplus lines insurers.

Surplus lines placements can best be understood by examining how communications flow amongst the parties. Transmission of documents (and verbal communications) including proposals (also called "quotes" or "quotations"), binders, policies, and everyday emails amongst insureds, retail and wholesale brokers, and surplus lines insurers can be compared to a railroad train traveling back-and-forth on a single track, with two intermediate stations between the end of the line in each direction. The train travels from Station A, to Station B, to Station C, and finally to Station D (blue arrows). It then reverses direction and goes back to C, then B, and finally A (brown arrows). Back-and-forth it goes, always stopping at each station.

In this example we can think of Station A as the insured, Station B as the retail broker, Station C as the wholesale broker, and Station D as the insurance company. Visually it looks like this:



Communications going "out" from the insured follow the top (blue) arrows. Communications "coming back" from the insurance company follow the lower (brown) arrows. There is no route between the Insured at Station A and the Wholesale Broker at Station C which does not go through the Retail Broker at Station B. This train always makes every stop in both directions.

The flow of communications described above applies to all lines of insurance. This process correctly places the retail broker as the insured's exclusive contact, while providing access – through a wholesale broker – to insurers which the retail broker cannot access directly. The wholesale broker multiplies the reach of the retail broker to the benefit of the insured, albeit by introducing an additional party to the process. Throughout the documentation which I reviewed for this case there are numerous examples of this communications flow.

The vast majority of all insurance is arranged without the involvement of a wholesale broker. In that case Station C is eliminated, and the Retail Broker communicates directly (back-and-forth) with the Insurance Company.

MMA could not have procured MCF's coverage from Cincinnati Specialty on their own – they needed to work through a wholesale broker such as CSUPR. Only a surplus lines

---

CONFIDENTIAL     Page 5 of 17

Case 2:16-cv-00885-LA     Filed 03/09/19     Page 5 of 17     Document 85-2

broker, so licensed, can directly access a surplus lines insurer. If MMA had attempted to access Cincinnati Specialty directly, they would have been told to contact CSUPR.

There are many surplus lines brokerage operations in the US. Surplus lines insurers choose which ones they are willing to work through. Similarly, surplus lines brokerages choose which retail brokers they are willing to work with. The latter arrangements are documented in "Producer Agreements" which lay out the terms between the retail and surplus lines brokers. Many times the surplus lines broker is affiliated with either the retail broker or the insurer. In this case, CSUPR is affiliated with the insurer, Cincinnati Specialty.

Where there are few (or no) admitted insurers willing to write the risk, access to surplus lines insurers becomes especially important for the insured and their retail broker.

(b) The declarations page of the relevant policy[14] includes what is commonly referred to as the "surplus lines warning stamp" as well as the details of the surplus lines taxes and fees:

| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT. | | |
|---|---|---|
| COVERAGE PARTS | | PREMIUM |
| DEPOSIT PREMIUM | | |
| Commercial Property | $ | 25,558.00 |
| Terrorism Risk Insurance Extension Act | | Excluded |
| Broker Fee | $ | 35.00 |
| TOTAL POLICY PREMIUM | $ | 25,593.00 |
| CANCELLATION MINIMUM EARNED PREMIUM IS 25.0% OF TOTAL POLICY PREMIUM. | | |
| Surplus Lines Taxes | $ | 767.79 |
| Stamping Fee | | N/A |
| Other Taxes or Fees | | N/A |
| TOTAL | $ | 26,360.79 |
| Premium is subject to annual audit: Yes / No | | |

NOTICE TO POLICYHOLDER:
This insurance contract is with an Insurer which has not obtained a certificate of authority to transact regular insurance business in the state of Wisconsin, and is issued and delivered as a surplus line coverage pursuant to s. 618.41 of the Wisconsin Statutes. Section 618.43(1), Wisconsin Statutes, requires payment by the policyholder of 3% tax on gross premium.

Historically, wording such as the above "NOTICE TO POLICYHOLDER" was stamped onto the declarations page with a rubber stamp, often in red ink. The policy was said to have been "stamped".

---

[14] See CSUPro0001

(c) The property and liability binders[15] effective 4/29/2015 contained the same warning as shown above, again in bold print.

(d) It is my understanding that surplus lines taxes and fees shown above (and on various policy endorsements) were properly invoiced and collected by MMA.

(e) I understand that it is alleged that the proposal transmittal letter did not contain the surplus lines "warning". I further understand that it is alleged that Mr. Niestrom, personally, needed a surplus lines license.

The Wisconsin Office of the Commissioner of Insurance has stated[16]:

> "Based on the information presented, there doesn't appear to be any licensing or other insurance violation here. The P & C broker [Mr. Niestrom] had a risk that he was unable to underwrite, so he appropriately contacted a surplus lines broker who was correctly licensed to do it. The P & C broker doesn't need to hold a surplus lines license in order to seek coverage for a risk he cannot provide through a surplus lines broker. Furthermore, the head of the P &C brokerage [MMA] also holds a surplus lines license - certainly not every broker in the entity needs to have his/her own surplus lines authority."

(f) In any event, the fact that Cincinnati Specialty was a surplus lines insurer did not harm MCF: Cincinnati Specialty did not file bankruptcy, nor was their denial of the loss impacted by their surplus lines status. There is no reason to believe that the outcome as regards the Farwell loss would have been any different were Cincinnati Specialty an admitted insurer in Wisconsin.

**OPINION NUMBER TWO:**

Mr. Leatzow's opinion that Mr. Niestrom and MMA failed to meet the relevant standard of care by not taking into consideration that MCF's interest in the Farwell property was as a mortgagee, not the owner, is unfounded.

**Basis for Opinion Number 2:**

(a) There is no evidence of any pre-loss discussion between MCF and MMA regarding MCF's mortgagee interest in the Farwell property. Contrary to paragraph 24 of the 1/4/17

---

[15] See MMA02530 and MMA02543.

[16] See MMA03515 – 516.

CONFIDENTIAL     Page 7 of 17

Case 2:16-cv-00885-LA    Filed 03/09/19    Page 7 of 17    Document 85-2

Amended Complaint and Mr. Leatzow's assertion[17], it appears that Mr. Niestrom was unaware of MCF's mortgagee interest in the Farwell property until after the Farwell loss.

(b) Mr. Niestrom and MMA consistently arranged and updated MCF's insurance based on requests from MCF, as documented in numerous emails between MMA and MCF.

(c) Mr. Niestrom's January 6, 2015 email[18] to Mr. Shemanske and Mr. Chandler apparently confirms an earlier telephone conversation during which MCF requested that the Farwell location be added to the insurance. With a limit of $1,600,000 it was, at the time, the highest-valued location to be insured on MCF's policy.

(d) Given the degree of specificity and detail in the Farwell emails (also see MAA00001-03) and relatively high value of the Farwell property, it seems unlikely that Mr. Niestrom would have forgotten, or neglected to mention to the underwriter, that the location was not owned by MCF but was instead collateral for a loan, had he indeed been provided that information.

(e) To hold MMA responsible for not acting on facts of which MMA was not aware would put the retail broker in the unreasonable position of the ultimate insurer of all risk, known and unknown.

## OPINION NUMBER THREE:

Mr. Leatzow's opinion that Mr. Niestrom and MMA failed to meet the relevant standard of care by failing to recommend forced placed insurance is incorrect.

(a) Even if Mr. Niestrom had been made aware of the nature of MCF's interest in the Farwell property (as mortgagee) there was no need for MMA to procure an additional or different property policy to cover this location because the relevant Cincinnati Specialty policy covered MCF's insurable interest in lender risk locations[19] under the same terms as for owned locations. This is evident from the policy as well as from the loss adjustment by Cincinnati Specialty:

> 1) The relevant policy's extensive description of "Building" as a class of "Covered Property" is absent any exclusion or limitation as regards mortgagee interests, and

> 2) Cincinnati's claim denial communications is absent any indication that mortgagee interests were not intended to be covered. Importantly, Cincinnati Specialty has never suggested that their policy excluded lender interest locations such as the Farwell property.

(b) The fact that the relevant Cincinnati Specialty policy included coverage for mortgage interests consistent with its coverage for owned properties, belies the contention that Mr.

---

[17] First complete paragraph on page 5 of 12 of Mr. Leatzow's January 31, 2018 report.

[18] See MCF000580-581.

[19] The relevant policy wording can be found at CSUPro00042 – 43.

Niestrom should have sold forced placed coverage to MCF, or that by not doing so his actions somehow fell below the standard of care for an insurance broker.

(c) As an alternative to insuring MCF's mortgagee interest in the Farwell property under the Cincinnati Specialty policy, Mr. Niestrom could have pursued mortgage impairment[20] (and subsequently forced placed[21]) coverage, but that approach would have been excessively expensive. Just because an alternative insurance product existed, in this case a more expensive one, does not mean that covering the Farwell property under the Cincinnati Specialty policy was wrong or fell below the standard of care.

Because MCF had few properties where their interest was as mortgagee (and relatively small loans at each), finding a market for their mortgage impairment and forced placed risk would have been challenging. Generally, mortgage impairment coverage is written on a portfolio basis for hundreds or thousands of mortgages for financial institutions such as banks. There are few insurers which write this line of insurance, syndicates at Lloyd's of London likely being the largest.

Forced placed coverage is generally written on a scheduled basis, meaning that only locations which have been reported to the underwriter are covered. As with mortgage impairment insurance, forced placed insurance is a highly bespoke coverage for which there is a very limited marketplace. Underwriters prefer large schedules of property where there is "spread of risk" and substantial premium to be earned.

Even if MMA could have found a mortgage impairment / forced placed market for this one location, MCF would have been faced with a disproportionately high premium to insure the Farwell property. There is no standard of care which requires, or even suggests, that brokers should present their clients with insurance options which are objectively worse than the *status quo*.

---

[20] According to IRMI, mortgage impairment insurance is (in relevant part): "Specialty property insurance for mortgage companies that provides coverage for the lender's interest in mortgaged property in the event of uninsured or underinsured damage to the property—typically, because the borrower has failed to maintain the required property insurance and name the lender as mortgagee. Mortgage impairment insurance usually is written on independently filed forms, and there are many variations in coverage from one form to another." The lender pays for mortgage impairment insurance as a cost of doing business.

[21] Forced placed coverage (also called "lender placed") is designed to be purchased by the lending institution when the borrower has failed to maintain the insurance which is required by the loan. Mortgage impairment coverage normally terminates once the lender is aware of the default - forced placed coverage fills the gap. The cost of this coverage is charged back to the borrower, according to the terms of the loan.

## OPINION NUMBER FOUR:

Mr. Leatzow's summary opinion that "[MMA's and Mr. Niestrom's] collective negligence resulted in the denial of coverage by Cincinnati Specialty" is incorrect.

This rebuttal refers to and relies on Julie Didier's initial claim denial letter to Mr. Chandler, dated March 11, 2016 (MCF000379 – 384 and MCF000379 - 384) and her subsequent denial letter of May 16, 2016 (MCF000374 – 377).

### Basis for Opinion Number 4:

The first reason for the denial[22] was: Failure to protect the property from loss.

This reason rests on the following policy wording:

> "(1) You do your best to maintain heat in the building or structure; or
>
> (2) You drain the equipment and shut off the supply if the heat is not maintained."[23]

(a) According to MCF, upon starting foreclosure proceedings against RNTSDU (the property owner and mortgagor) they attempted to get utilities restored and thus preserve the property. MCF has asserted that their effort qualifies as "do[ing] your best". In any event, MMA had no knowledge of, responsibility for, or influence over, whether MCF maintained adequate heat in the building.

(b) Cincinnati Specialty's denial letter[24] cites the City of Milwaukee's database entries from 2015:

> November 13: code violations for defective heating
>
> November 18: placarding of the building due to defective heating.

MMA had no knowledge of these violations and no responsibility for, or influence over, whether MCF maintained adequate heat in the building.

(c) I saw no evidence that Mr. Niestrom or others from MMA visited MCF's locations (or the Farwell location specifically), nor that MMA was involved in any loss control programs or efforts undertaken by MCF. MMA was not integrated into MCF's operations or management, nor did MCF request such operational or risk control advice from MMA. MMA was not involved in MCF's risk control decisions such as whether adequate heat was being maintained in MCF's buildings.

(d) Cincinnati Specialty had the ability to inspect MCF's locations[25], and from time to time did so. They could have inspected Farwell and then advised both MCF and MMA of the

---

[22] Mr. Leatzow's report does not address Cincinnati Specialty's claim for rescission.

[23] See MCF000381 and CSUPro00023.

[24] See MCF000380.

[25] See MMA01745-747.

CONFIDENTIAL        Page **10** of **17**

Case 2:16-cv-00885-LA    Filed 03/09/19    Page 10 of 17    Document 85-2

urgency of the issues that existed there, but they did not. In any event, MMA had no knowledge of, responsibility for, or influence over, whether MCF maintained adequate heat in the building.

(e) Regardless of how the coverage issue of MCF's efforts to protect the Farwell property is decided, clearly MMA had no ability to advise or require MCF to do one thing or another in that regard.

## Remarks

To a reasonable degree of professional certainty, my opinions are as stated above.

In the event that I am provided with additional materials and/or that I may be asked to review additional documents or transcripts of deposition and trial testimony, including depositions that are either open or yet to be scheduled and reports and depositions of other experts, or other documents, I may incorporate my review of them into my testimony at trial. I reserve the right for addition to, as well as amendment or deletion of, the opinions expressed above as additional discovery is provided.

Respectfully submitted on _____ MAY 31 _____, 2018

_____

William S. Way, CPCU, ARM
Golden, Colorado

# EXHIBIT A

CV of William S. Way, CPCU, ARM

# WILLIAM SERVISS WAY, CPCU, ARM

## Bill Way Litigation, LLC

RISK AND INSURANCE CONSULTANT

19580 W. 59th Drive, Golden, CO 80403-2212

224-475-9979   BillWayToday.com   Bill@BillWayToday.com

### *Education*

- B.S., Worcester Polytechnic Institute, 1972, Chemistry

### *Professional Designations*

- Chartered Property Casualty Underwriter, CPCU
- Associate in Risk Management, ARM
- Associate in Management, AIM
- Associate in Marine Insurance Management, AMIM

### *Licenses (formerly held)*

- Illinois Resident Property/Casualty Broker
- Various non-resident insurance licenses
- Reinsurance Broker, South Carolina

### *Employment*

- 1995 – July, 2016: Marsh USA Inc.: Senior VP Global Property, Chicago, IL (Retired 7/29/16)
- 1989 – 1995: Protection Mutual Insurance Company (now part of FM Global): Branch Manager, St. Louis, MO
- 1988 – 1989: Protection Mutual Insurance Company: Producer, Dallas, TX
- 1985 – 1988: Kemper Insurance: HPR Special Accounts Underwriting Manager, Long Grove, IL
- 1984 – 1985: Commerce & Industry (AIG): Manager, Chicago Branch
- 1972 – 1984: Kemper Insurance: HPR (Highly Protected Risk) Department property risk engineering, underwriting, sales, management, Boston, MA

### *Areas of Specialization / Expertise*

- Broker / Agent standard of care
- Marsh "Licensed Driver" (broker Subject Matter Expert) in property risk and insurance
- Analysis of clients' hazard risks and mitigation strategies, and creation of manuscript policy language to achieve appropriate coverage based on that analysis
- Master Trust Insurance Programs for Financial Institutions

- Design and implementation of complex global property risk and insurance programs for Middle Market and Fortune 100 clients
    - Policy limits and insured locations valued in excess of $1 billion
    - Fronting of local policies in 50+ countries
    - Design and implementation of "shared and layered" placements with 25+ insurers including Bermudian, Chinese, European, Japanese, London, US, and other markets
    - Large retentions ($5,000,000 +)
    - Utilization of captives, including so-called "TRIA captives"
    - Combination property / stock throughput program design and implementation
    - Risk mitigation versus insurance solutions
    - Insurance solutions for contractual obligations (e.g. tenant / landlord or supply chain relationships)
- Chicago Partnership Professional Standards Officer responsible for:
    - Interpreting and applying Professional Standards to specific client situations
    - Performing standard of care audits of Marsh brokers and offices throughout the USA
    - Preparing for and responding to internal standard of care audits of Marsh brokers and offices in the Midwest USA
    - Training approximately 50 colleagues in property risk and insurance and Marsh Professional Standards
- Wrote and presented a 3-day advanced property insurance seminar called Property Program Design and Delivery (P2D2) in various Marsh offices across the USA
- Frequent participant in Marsh client and prospect webinars

*Miscellany*
- Born Boston, Massachusetts June 29, 1950

# EXHIBIT B

Listing of cases in which I have testified
Records Pursuant to
Federal Rule of Civil Procedure 26(a)(2)(B) Designated Cases

| Year | Case (short name) | Counsel | D | T | A | Court | Case No. |
|---|---|---|---|---|---|---|---|
| 2016 | New Jersey Transit v. Various Underwriters | Clyde & Co Atlanta, GA | Y | | | Superior Court of New Jersey Law Division: Essex County | L-6977-14 |
| 2017 | All Islands Inc. dba Century 21 All Islands v. Partners E&O Insurance Services, Inc. | Deeley King Pang & Van Etten Honolulu, HI | Y | Y | | Circuit Court of the First Circuit, State of Hawai'i | Civil No. 13-1-0547-02 |
| 2018 | New York University v. Factory Mutual Insurance Company | Winston & Strawn New York, NY | Y | | | United States District Court Southern District of New York | Civil Action No: 15-cv-8505 |

| Year | Case (short name) | Counsel | D | T | A | Court | Case No. |
|---|---|---|---|---|---|---|---|
| 2018 | Protech Services v. Capital Providers Insurance Services, Inc. | Cannata, O'Toole, Fickes & Almazan LLP San Francisco, CA | Y | | | Superior Court of the State of California County of Los Angeles | BC54840 |

D = Deposition
T = Trial
A = Arbitration

# EXHIBIT C

## Document Log

| Description of Document | Date of Document | Identification Bates Stamp |
|---|---|---|
| Amended Complaint | 1/4/2017 | |
| Deposition of Richard Niestrom (MMA) | 11/15/2017 | |
| Expert Report of David Stegall | 1/31/2018 | |
| Expert Report of Jim Leatzow | 1/31/2018 | |
| Expert Report of Corey Nelson | 1/30/2018 | |
| Niestrom deposition exhibits | Various | Various |
| Cincinnati Specialty property policy CSU0069850 4/29/15 - 4/29/16 | 4/29/2015 | CSUPro0001 - 466 |
| Plaintiff's Second Set of Requests to Admit... | 5/3/2018 | |
| Various - MCF production | Various | MCF000001-001854 |
| Various - MMA production | Various | MMA 00001 - 03514 |
| Various - CSUPR production | Various | CSUPro000467 - 002850 |