# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**MIDWEST COMMERCIAL
FUNDING, LLC,**
        **Plaintiff,**

     **v.**                          **Case No. 16-C-0885**

**CINCINNATI SPECIALTY
UNDERWRITERS INSURANCE
COMPANY, et al.,**
        **Defendants.**

_____

## <u>DECISION AND ORDER</u>

Midwest Commercial Funding, LLC, purchased commercial property insurance from Cincinnati Specialty Underwriters Insurance Company.[1] During the winter of 2016, one of the covered properties sustained a loss caused by water lines that froze and burst. Midwest filed a claim under the policy, which Cincinnati denied based on an exclusion for water damage caused by frozen pipes. Cincinnati also threatened to rescind the policy on the ground that Midwest misrepresented its interest in the property when it applied for the insurance. Cincinnati alleges that it issued the property policy believing that Midwest owned the property. In fact, Midwest had only a security interest. Cincinnati alleges that had it known Midwest did not own the property, it would not have issued the property policy. Instead, it would have told Midwest that it needed "forced place" insurance.

---

[1] In this opinion, I will refer to defendant Cincinnati Specialty Underwriters Insurance Company as "Cincinnati." However, because this case involves other entities that use the Cincinnati name, I will sometimes use the defendant's full name to distinguish it from these other entities.

Following the denial of coverage, Midwest filed this suit for breach of the insurance contract and bad faith against Cincinnati. Cincinnati filed a counterclaim for rescission of the policy and a declaration of no coverage. In addition to suing Cincinnati, Midwest sued Marsh & McLennan Agency, LLC—the insurance brokerage firm that assisted Midwest in procuring the policy—and CSU Producer Resources, Inc.—the broker that placed the policy with Cincinnati. Midwest asserts claims against these parties that are best described as back-ups to its main claim against Cincinnati. Midwest alleges that Marsh and CSU Producer Resources violated several provisions of Wisconsin's insurance code in procuring the policy for Midwest, which resulted in the creation of an illegal insurance contract. Under Wisconsin law, if a policy is illegal and the insurer does not pay a claim or loss payable under the policy, then the insured may look to any person who assisted in the procurement of the policy for payment, provided that the person knew or should have known that the policy was illegal. *See* Wis. Stat. § 618.44. Midwest contends that if the Cincinnati policy is found to cover the loss at issue in this case and is also found to be an illegal policy, then Marsh and CSU Producer Resources will be jointly and severally liable with Cincinnati for payment of the loss.

In addition, Midwest brings an alternative claim for professional negligence against Marsh. This claim relates primarily to Cincinnati's counterclaim for rescission. Midwest alleges that Marsh should have advised it that because it held only a security interest in the property, the type of insurance it needed was forced-place insurance. Thus, argues Midwest, if Cincinnati succeeds on its rescission claim, Marsh will be liable for making it whole. Midwest also contends that a forced-place policy would have

2

contained a more favorable freeze exclusion than the Cincinnati property policy, and that therefore Marsh may be liable for negligence even if Cincinnati is not entitled to rescind the property policy.

Each party has filed a motion for summary judgment on certain claims and issues, which I address in this order.

## I. BACKGROUND

Midwest manages property, develops real estate, and lends money to other entities and individuals for use in rehabilitating or managing real estate. In August 2014, Midwest loaned money to an entity known as RNTSDU Investments, LLC. At the time, RNTSDU owned a commercial property located at 1442 N. Farwell Avenue in Milwaukee, Wisconsin. The property served as collateral for the loan. The terms of the loan required RNTSDU to maintain property and liability insurance on the property and to provide proof of such insurance to Midwest.

In late 2014 or early 2015, RNTSDU failed to provide proof of insurance for the Farwell property. Midwest notified its accounting firm, Matrix Enterprises, Inc., that it needed to secure its own insurance for the property. Midwest and Matrix then contacted Midwest's insurance broker, Richard Niestrom of the Marsh agency, to obtain coverage for the Farwell property.

Due to the frequency with which Midwest would purchase and sell real estate, Niestrom was frequently asked to add or remove properties from the schedule of insured properties that was attached to Midwest's existing policies. Thus, when Midwest informed Niestrom that it needed insurance for the Farwell property, he added that property to Midwest's existing commercial property policy, which had been issued by

Berkley Regional Specialty Insurance. It appears that Niestrom simply assumed that Midwest owned the property. He did not ask Midwest about its ownership interest in the property, and he does not claim that anyone at Matrix or Midwest specifically told him that Midwest owned the property.

The misunderstanding about Midwest's interest in the property caused Niestrom to procure the wrong kind of insurance for the Farwell property. According to Cincinnati and CSU Producer Resources, when a lender needs insurance for real property held as collateral for a loan, the proper type of coverage to obtain is "forced place" insurance. This is insurance that a lender takes out on a property after the borrower fails to maintain required coverage. Ordinarily, the lender will charge the borrower for the cost of the insurance. *See Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1316–17 (11th Cir. 2018). Here, Niestrom added the Farwell property to Midwest's existing property policy instead of procuring a separate forced-place policy.

Because the Berkley policy to which Niestrom added the Farwell property was expiring in April 2015, Niestrom also began searching for a new insurer to provide property and casualty insurance to Midwest. Because of the risks involved in Midwest's business, Niestrom could not obtain property and casualty insurance from an ordinary "admitted" insurer. Instead, Niestrom needed to access what is known as the "surplus lines" insurance market.

To understand surplus-lines insurance, some background on insurance regulation is helpful. Most states heavily regulate typical insurers, such as by approving their rates, examining the terms of their policies, and monitoring their financial solvency. The insurers that are subject to such extensive regulation in a state are known as

"admitted" or "authorized" insurers. *See* Richard R. Spencer, Jr., *Surplus Lines Insurers and Guarantee Funds*, 10 Seton Hall Leg. J. 93, 96 (1986). The goal of such regulation is consumer protection. *See* Congressional Research Service, *Surplus Lines Insurance: Background and Current Legislation* (July 22, 2010) (summary page). Such extensive regulation, however, creates barriers to entry into the insurance market and reduces the types of policies available for consumers to purchase. *Id.* When a consumer has an insurance need that cannot be met by an authorized or admitted insurer, the state will allow that consumer to purchase insurance from certain unauthorized or nonadmitted insurers. These are surplus-lines insurers, and they are regulated differently than admitted insurers. *Id.* While admitted insurers are regulated directly, surplus-lines insurers are typically regulated indirectly through insurance brokers who are licensed by the state to place surplus-lines insurance. *See id.*; Joseph A. Kilbourn & Jeffrey M. Winn, *Excess, Surplus Lines and Reinsurance: Recent Developments*, 25 Tort & Ins. L.J. 288, 304 (1989). Although nearly any insurance could be sold on a surplus-lines basis, in general such insurance covers unusual risks that the admitted insurance market is unprepared or unable to accept. *See* Spencer, 10 Seton Hall Leg. J. at 96.

Because Niestrom could not find an admitted insurer that would issue commercial property and casualty insurance to Midwest, he contacted CSU Producer Resources, which places insurance with Cincinnati Specialty Underwriters Insurance Company, a surplus-lines insurer. CSU Producer Resources acted as what might be described as a "wholesale broker" in the transaction. A wholesale broker places business brought to it by a retail broker—which in this case was the Marsh & McClennan Agency—with an insurer, often a nonadmitted insurer. *See Crusader Ins.*

*Co. v. Harry W. Gorst Co.*, No. B182480, 2016 WL 1494110, at *1 (Cal. Ct. App. June 1, 2006); www.irmi.com/term/insurance-definitions/wholesale-broker (last viewed July 11, 2019). Essentially, when a retail broker has a risk that it cannot place with an ordinary insurer, it contacts a wholesale broker, which will usually have specialized expertise and access to surplus-lines insurers. In this case, CSU Producer Resources was what might be described as a "captive" wholesale broker, in that it placed policies exclusively with Cincinnati. CSU Producer Resources was in the same corporate family as Cincinnati, performed underwriting and collected premiums for Cincinnati, and had binding authority from Cincinnati.

When Niestrom turned to CSU Producer Resources, he worked primarily with Thomas Berryman, who was CSU Producer Resource's underwriting supervisor. Berryman did not hold a license as a surplus-lines broker or agent in Wisconsin. However, once Niestrom and Berryman agreed on the policies to purchase for Midwest, CSU Producer Resources used the surplus-lines license number of Scott Hintze, its director of underwriting, to formally place the insurance with Cincinnati. Hintze's name and license number are printed on the declaration pages of the policies, where he is identified as the "broker" for the transaction. *See, e.g.,* ECF No. 49-3 at p. 2 of 467.

After the policies were procured, copies were sent to Niestrom as Midwest's agent. Niestrom states that he forwarded the policies to Midwest in July 2015. Midwest denies having received copies of the policies at that time. The policies went into effect on April 29, 2015, with the Farwell property listed as a covered property under the commercial property policy.

On April 27, 2015, Midwest initiated foreclosure proceedings against RNTSDU and the Farwell property. On October 28, 2015, Midwest obtained a judgment of foreclosure with a three-month redemption period. On December 19, 2015, during the redemption period, Midwest received notice that gas and electric service had been turned off at the Farwell property. That same day, Midwest contacted the utility company and demanded that gas and electric service be restored. However, the utility refused to turn the power back on. Between December 21, 2015 and January 15, 2016, Midwest repeatedly called and emailed the utility in an attempt to get gas and electric service restored. Among other things, Midwest submitted a commercial application to transfer the account into Midwest's name, paid an unrelated bill on a different property that the utility had sent to the wrong address, provided documentation necessary to show that Midwest had filed a foreclosure action against the owner of the Farwell Property, and ensured that the utility company had access to the property in order to restore power. According to Midwest, the utility company dragged its heels. Finally, on January 9, 2016, the utility company sent a crew to the Farwell property to restore the gas and electric, but the crew did not have everything that it needed to turn the electricity back on.

The utility crew returned to the property on January 15, 2016 and discovered standing water in the electrical room. Sometime between the crew's two visits to the property, a water line in the building froze and burst. Midwest contends that the water damage in the building was extensive, and that the total loss was more than $2.5 million, the limits of the Cincinnati policy.

After discovering the loss, representatives of Midwest searched its records to find copies of the Cincinnati policies but could not locate them. Midwest believes that it did not receive copies of the policies before the loss occurred. After the loss, Niestrom filed a claim with Cincinnati on Midwest's behalf.

Another company within the Cincinnati family—Cincinnati Insurance Company—adjusted Midwest's claim. On March 11, 2016, it sent Midwest a letter in which it formally denied Midwest's claim on the ground that the loss fell within a policy exclusion for water damage caused by freezing. *See* ECF No. 49-8. The exclusion stated in relevant part that Cincinnati would not pay for water damage caused by frozen and burst pipes unless the insured "[did its] best to maintain heat in the building or structure." ECF No. 49-3 at 24. Cincinnati Insurance Company concluded that Midwest did not do its best to maintain heat in the building.

In its March letter, Cincinnati also informed Midwest that it was investigating the facts surrounding Midwest's application for the insurance to determine whether the policy should be rescinded. Cincinnati stated that because Midwest had only a security interest in the property, it should have obtained forced-place insurance rather than property insurance. Cincinnati asked Midwest to provide it with information about its communications with Marsh at the time it applied for the policy. Cincinnati stated that if it determined that misrepresentations were made when the policy was procured, it would consider rescinding the policy. Cincinnati stated that it "specifically reserve[d] the right to rescind the policy" after it completed the investigation. ECF No. 49-8 at 6. However, Cincinnati did not attempt to formally rescind the policy until August 2, 2016, when it filed its counterclaim in this action and included a count for rescission.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

At the outset, I note that no party has moved for summary judgment on the central coverage issue in this case, *i.e.,* whether Midwest used its best efforts to maintain the heat in the Farwell property. Instead, each party moves for summary judgment on other issues, which I discuss in turn.

### A.    Whether Cincinnati May Rely on Policy Exclusions

Midwest moves for summary judgment on its claim for breach of contract on the ground that Cincinnati is barred from denying coverage based on policy exclusions, including the freeze exclusion. This is so, Midwest contends, because Midwest did not receive a copy of the policy before the loss occurred. Midwest's position is based on a case decided by the Wisconsin Court of Appeals holding that "an insurer may not deny coverage based on limitations or exclusions in a policy, even if clearly stated, where the insured was not otherwise informed of such provisions." *Kozlik v. Gulf Ins. Co.*, 268 Wis. 2d 491, 503 (Ct. App. 2003).[2] Cincinnati contends that it is not barred from denying coverage based on the policy exclusions because it (or CSU Producer Resources)

---

[2] Midwest also cites *Miller v. Safeco Insurance Co. of North America*, 683 F.3d 805, 811 (7th Cir. 2012), but in that case, the Seventh Circuit merely applied the rule stated in *Kozlik*. Thus, I focus on the *Kozlik* case.

provided copies of the policy to the Marsh & McClennan Agency—Midwest's agent in the insurance transaction—before the loss. Midwest, in turn, contends that notice to its agent was not sufficient and that, to enforce the policy exclusions, Cincinnati was required to provide copies of the policy directly to Midwest or ensure that Marsh provided copies to Midwest.

In *Kozlik*, the insured was a person who rented a car from Enterprise Rent-A-Car. When the driver went to the Enterprise office to rent his car, he purchased accident insurance. The Enterprise employee who handled the rental transaction did not provide the driver with a copy of the insurance policy. Later, the driver used the rental car while intoxicated and caused an accident in which he was killed. When his estate made a claim under the rental insurance, the insurance company denied coverage based on a policy exclusion for losses caused by intoxicated driving. The Wisconsin Court of Appeals held that because Enterprise did not provide the driver with a copy of the policy before the loss, the insurance company could not deny coverage based on an exclusion.

*Kozlik* was not a case in which copies of the policy were provided to an insured's agent. The insured was a natural person who procured the insurance without the assistance of an agent. Here, in contrast, Midwest is a corporation and thus can act or receive notice only through its agents. *See Hensel v. Hensel Yellow Cab Co.*, 245 N.W. 159, 163–64 (Wis. 1932). And, unlike in *Kozlik*, Midwest was represented in the insurance transaction by an insurance broker—the Marsh & McClennan Agency—that did receive copies of the policy. Under general principles of agency law, a principal is charged with knowledge of matters learned by an agent within the scope of the agency.

*See, e.g., Johnson v. Associated Seed Growers*, 240 Wis. 278, 282–83 (1942). This is true even if the agent does not actually communicate the knowledge to the principal. *See Admiral Ins. Co. v. Paper Converting Mach. Co.*, 339 Wis. 2d 291, 312 (2012). Thus, by providing the policy to Marsh, Midwest's agent for insurance matters, Cincinnati satisfied the rule of *Kozlik* requiring notice to the insured of the policy's exclusions.

Moreover, the rule of *Kozlik* is based on the premise that "it would be unjust to permit an insurance company to accept premiums and then deny liability based on an exclusion of which the insured was not aware because the insurance company had not informed him or her of the exclusion *or given him or her the means to ascertain its existence*." 268 Wis. 2d at 502–03 (emphasis added). In the present case, there is no dispute that Marsh acted as Midwest's agent with respect to the insurance at issue and that Midwest could have asked Marsh to provide it with a copy of the policy had anyone at Midwest wanted to review it. Thus, in providing the policy to Marsh, Cincinnati gave Midwest the "means to ascertain" the existence of the freeze exclusion. Accordingly, Cincinnati is not barred from denying coverage based on the exclusion.

In any event, even if Cincinnati could not enforce the policy exclusion unless Marsh forwarded the policy to someone at Midwest, there is a genuine factual dispute over whether Marsh did so forward the policy. Niestrom states in his declaration that his regular practice was to forward copies of newly issued policies to an insured after he finished reviewing them. Decl. of Richard Niestrom ¶ 15, ECF No. 62. He states that he followed this practice with respect to the Cincinnati policies and delivered them to Midwest no later than July 2015, when he met with representatives of Midwest to "go

through the [Cincinnati] policies." *Id.* Midwest denies that Niestrom actually provided it with copies at that time, but Niestrom's declaration is sufficient to prevent entry of summary judgment for Midwest on the question of whether Niestrom provided copies of the policy to Midwest before the loss. For this reason, Midwest is not entitled to summary judgment on its claim against Cincinnati for breach of contract.

## B.   Rescission

Both Midwest and the Marsh & McClennan agency move for summary judgment on Cincinnati's claim for rescission. They contend that Cincinnati did not comply with two statutory provisions that restrict an insurer's ability to rescind a policy. First, they point to Wis. Stat. § 631.11(1)(a), which states that "[n]o representation or warranty made by a person other than the insurer or an agent of the insurer in the negotiation for an insurance contract affects the insurer's obligations under the policy" unless it is stated either in the policy, a written application that is made part of the policy by amendment or endorsement, or a written communication from the insurer to the insured within 60 days after the policy's effective date. Second, Midwest and Marsh point to Wis. Stat. § 631.11(4)(b), which provides that an insurer may rescind a policy only if the insurer notifies the insured of its intent to rescind the policy within 60 days of "acquir[ing] knowledge of sufficient facts to constitute grounds for rescission of the policy."

In the present case, Cincinnati does not dispute that it did not satisfy these statutory provisions. Cincinnati does not contend that Midwest or Marsh made a statement about Midwest's owning the Farwell property that was included in the policy.[3]

_____

[3] At one point, Cincinnati references an "owned property schedule" and states that some representation was "within the policy itself." Cincinnati Br. at 18 n.2, ECF No. 77.

Cincinnati does not contend that any such statement was included in the application for the policy or that the application was incorporated into the policy by amendment or endorsement. And it does not contend that the statement was included in a written communication to Midwest within 60 days of the policy's effective date. Likewise, Cincinnati does not contend that it provided notice of its intent to rescind the policy within 60 days of learning sufficient facts to support its rescission claim.

Instead, Cincinnati argues that its rescission claim satisfies a different provision of the Wisconsin Statutes, Wis. Stat. § 631.11(1)(b). Under this provision, no misrepresentation by an insured constitutes grounds for rescission of the policy unless the insured knew or should have known that the representation was false and either (1) the insurer relied on the misrepresentation or the misrepresentation was material or made with intent to deceive, or (2) the fact misrepresented contributed to the loss. However, Cincinnati's argument that it satisfies § 631.11(1)(b) misses the point of Midwest's and Marsh's motions for summary judgment on the rescission claim. They do not dispute that a genuine factual dispute exists as to whether Cincinnati can prove the elements of a misrepresentation claim under § 631.11(1)(b). Rather, they contend that, to rescind the policy, Cincinnati must *also* satisfy § 631.11(1)(a) and § 631.11(4)(b). Cincinnati essentially concedes that Midwest and Marsh are entitled to summary judgment on the rescission claim by failing to argue either that it has satisfied these other statutory provisions or that it is not required to do so.

---

However, Cincinnati does not identify any document in the record that corresponds to this supposed "owned property schedule" and points to no part of the policy that contains a representation that Midwest owned the Farwell property. Thus, this somewhat cryptic argument is not a basis for avoiding summary judgment.

In any event, the undisputed evidence submitted by Midwest and Marsh establishes that Cincinnati did not comply with the notice provision of § 631.11(4)(b).[4] Cincinnati "acquire[d] knowledge of sufficient facts to constitute grounds for rescission of the policy," *id.*, no later than May 31, 2016. On that date, it sent a letter to Marsh describing the facts underlying its rescission claim and stating that it "appear[ed]" that Cincinnati had a basis to rescind the policy. ECF No. 62-1 at 2. But Cincinnati did not notify anyone that it intended to actually exercise its right to rescind the policy until more than 60 days later when, on August 2, 2016, it filed its counterclaim in this matter and asserted a claim for rescission. Accordingly, Midwest and Marsh are entitled to summary judgment on Cincinnati's rescission claim.

## C.    Claim for Professional Negligence Against Marsh

Midwest alleges that Marsh was negligent in insuring its interest in the Farwell property under a commercial property policy rather than a forced-place policy. Marsh moves for summary judgment on this claim on a number of grounds. I will discuss only one of those grounds—Midwest's failure to show that such negligence resulted in an actual injury or damages—because it is dispositive.

---

[4] The undisputed evidence also supports Midwest's and Marsh's position that Cincinnati has not satisfied Wis. Stat. § 631.11(1)(a). However, it is arguable that this statutory provision does not apply to Cincinnati's rescission claim. Unlike § 631.11(1)(b) and (4)(b), section 631.11(1)(a) does not expressly apply to a claim for rescission. Instead, it states that if the insured's representation is not incorporated into the policy or a communication made within 60 days, then the representation does not "affect[] the insurer's obligations under the policy." It is arguable that this phrase means something different than prohibiting an insurer from rescinding the policy, for subsection (4)(b) uses both that phrase and the term "rescission." Because of this possible difference in meaning, I will rely on Cincinnati's undisputed failure to satisfy the notice requirement of § 631.11(4)(b) as the reason to grant summary judgment on the rescission claim.

Under Wisconsin law, a negligence claim has four elements: (1) the existence of a duty of care on the part of the defendant; (2) a breach of that duty of care; (3) a causal connection between the defendant's breach and the plaintiff's injury; and (4) actual loss or damage resulting from the injury. *Emer's Camper Corral, LLC v. Alderman*, 386 Wis.2d 592, 602–03 (Ct. App. 2019). Marsh contends that Midwest has not satisfied its burden to show a genuine factual dispute on the latter two elements, *i.e.*, that Marsh's failure to procure forced-place insurance rather than commercial property insurance caused Midwest to suffer an injury that resulted in damages.

Midwest contends that it will suffer an injury from Marsh's alleged negligence if it is ultimately determined that either (1) Cincinnati is entitled to rescind its policy, or (2) Cincinnati properly denied coverage based on the freeze exclusion. I have already granted summary judgment to Midwest on Cincinnati's claim for rescission, so that is no longer a potential source of injury to Midwest.

As for the freeze exclusion, Midwest contends that if Cincinnati is ultimately found to have properly denied coverage based on the exclusion, then Marsh's failure to procure forced-place insurance will have caused it an injury. However, that could be so only if Cincinnati's policy does not cover the loss *and* the insurance that Marsh should have procured for Midwest would have covered it. Midwest has produced no evidence from which a reasonable jury could conclude that the insurance Marsh should have procured would have covered the loss. Although Midwest has an expert witness who opines that Marsh should have procured forced-place insurance, s*ee* Decl. of Jim Leatzow ¶ 5, ECF No. 100, this witness does not also opine that forced-place insurance would have covered the Farwell property loss. Indeed, when asked at his deposition

whether forced-place insurance would have covered the loss, the witness stated that he had no opinion on that matter. ECF No. 75-2 at p. 9 of 18. The witness does opine that forced-place insurance "would have been available in the marketplace" to cover Midwest's "insurable interests" in the Farwell property. *See* Leatzow Decl. ¶ 8. But to prove that Marsh's negligence caused it an injury, Midwest must do more than show that Marsh could have procured forced-place insurance to cover Midwest's insurable interest in the property. Marsh must also show that the forced-place policy that Marsh should have procured would have provided coverage for the exact loss that occurred at the property in January 2016. Because Midwest's expert has no opinion on this latter question, his testimony does not create a genuine factual dispute as to whether Marsh's failure to procure forced-place insurance caused Midwest an injury.

Midwest also points out that, after the loss, its new insurance broker procured a forced-place policy with a freeze exclusion that is slightly different than the freeze exclusion in the Cincinnati policy. *See* ECF No. 97-7 at p. 3 of 62. Both policies exclude water damage caused by frozen pipes unless the insured exercises some care in maintaining the heat in the building. However, under the forced-place policy, the exclusion does not apply unless the building was vacant for more than 30 days. Moreover, while the Cincinnati policy required the insured to use its "best efforts" to maintain the heat, the forced-place policy requires the insured to use "reasonable care" to maintain the heat.

Midwest's reliance on its new policy does not create a genuine factual dispute as to whether Marsh's negligence caused it an injury. This is for two reasons. First, Midwest has not shown that the new policy would have covered the Farwell loss had it

been in effect at the time. It has not pointed to evidence suggesting that the Farwell building was vacant for less than 30 days prior to the loss, and it has not developed a legal argument showing that there is a difference in meaning between "best efforts" (the term used in the Cincinnati policy) and "reasonable care" (the term used in the forced-place policy). Thus, although the freeze exclusion in the new policy is different than the freeze exclusion in the Cincinnati policy, Midwest has not shown that the difference would have resulted in a different coverage outcome.

Second, and more importantly, Midwest has not shown that all forced-place policies contain freeze exclusions that are more favorable to the insured than the freeze exclusions that appear in commercial property policies. In fact, Midwest states that forced-place policies are typically custom policies that are not written on standard forms. *See* Leatzow Decl. ¶ 6. Thus, even if the forced-policy that Midwest now holds would have covered the loss, it would not follow that the jury could reasonably conclude that *every* forced-place policy available in the marketplace would have covered the loss. For all the record shows, Marsh could have complied with the standard of care by obtaining a forced-place policy that contained the exact freeze exclusion that appears in the Cincinnati policy. And because Midwest's expert does not opine that the standard of care required Marsh to procure any specific forced-place policy, the jury would have no grounds for concluding that, had Marsh satisfied the standard of care, the loss in this case would have been covered.

For these reasons, I will grant summary judgment to Marsh on Midwest's claim for professional negligence.

**D.    Claim for Bad Faith Against Cincinnati**

Midwest alleges a cause of action for insurance bad faith against Cincinnati. Under Wisconsin law, such a claim has two elements. The first—which has been described as the "objective" element—is that "there is no reasonable basis for the insurer to deny the insured's claim for benefits under the policy." *Brethorst v. Allstate Property and Cas. Ins. Co.*, 334 Wis.2d 23, 46 (2011). The second, "subjective" element is that "the insurer knew of or recklessly disregarded the lack of a reasonable basis to deny the claim." *Id.*

In its amended complaint, Midwest identifies two separate bases for its bad-faith claim. First, Midwest alleges that Cincinnati did not have a reasonable basis to deny the claim based on the freeze exclusion. Am Compl. ¶¶ 89–90. Second, Midwest alleges that Cincinnati did not have a reasonable basis to assert a right to rescind the policy. *Id.* ¶¶ 88, 91. Cincinnati moves for summary judgment on all aspects of this claim. Midwest also moves for summary judgment on the claim, but only on the rescission component. That is, Midwest contends that even if Cincinnati had a reasonable basis to deny coverage based on the freeze exclusion (which it disputes), Cincinnati would still be liable for bad faith because it did not have a reasonable basis for asserting a right to rescind the policy.

Initially, I question whether Midwest can succeed on a claim for bad faith by showing that Cincinnati did not have a reasonable basis for asserting a right to rescind the policy without also showing that Cincinnati did not have a reasonable basis for denying coverage based on the freeze exclusion. As stated above, the focus of a bad-faith claim is on whether the insurer lacked a reasonable basis for denying the insured's

claim. *See, e.g., Brethorst*, 334 Wis. 2d at 46. Here, Cincinnati relied on two reasons to deny Midwest's claim: (1) the freeze exclusion, and (2) Midwest's alleged misrepresentation about its ownership interest in the Farwell property, which Cincinnati believes provides grounds for rescinding the policy. So long as one of these grounds was reasonable, Cincinnati would have had a reasonable basis for denying Midwest's claim. Thus, unless Midwest establishes that *both* grounds lacked reasonable support and Cincinnati either knew of or recklessly disregarded the lack of reasonable support, it could not prevail on a bad-faith claim.

Perhaps Midwest means to argue that rescission is a different act than claim denial, and that therefore an insurer's attempting to rescind a policy when it knows it has no reasonable basis for doing so can give rise to a freestanding claim for bad faith, even if the insurer had reasonable grounds to deny the insured's claim. However, Midwest does not cite, and I have been unable to find, any Wisconsin case that would support this theory of bad faith. To the contrary, the Wisconsin Supreme Court has held that an insured cannot prevail on a bad-faith claim unless it also shows that the insurer breached the insurance contract. *Brethorst*, 334 Wis. 2d at 52 (holding that "some breach of contract by an insurer is a fundamental prerequisite for a first-party bad faith claim against the insurer by the insured").

Moreover, even if rescission could be distinguished from claim denial for purposes of a bad-faith claim, it is not clear what the remedy would be in a case where the insurer properly denied coverage under the policy but wrongfully asserted a right to rescind the policy. The Wisconsin Supreme Court has held that a bad-faith claim cannot be used to create coverage that would not otherwise exist under the policy. *Id.*

(concluding that "creating coverage" is not an appropriate remedy for "bad behavior by insurers against their insureds"). Thus, if in this case Cincinnati properly denied coverage based on the freeze exclusion but wrongfully asserted a right to rescind, Midwest would not be entitled to coverage for the Farwell property loss. In moving for summary judgment on its bad faith claim, Midwest does not suggest that it suffered any injury or damages from Cincinnati's assertion of a right to rescind the policy other than the denial of its claim for coverage. Thus, Midwest's request for summary judgment on its bad-faith claim must be denied. Whether Cincinnati is liable for bad faith cannot be determined until the facts surrounding both of its grounds for denying the claim—the freeze exclusion and rescission—are established.

Cincinnati's motion for summary judgment on the bad-faith claim must also be denied. As discussed above, Cincinnati did not comply with the 60-day notice requirement that applies to a claim for rescission of an insurance policy. *See* Wis. Stat. § 631.11(4)(b). Instead, it filed its counterclaim for rescission more than 60 days after it acquired knowledge of the facts constituting grounds for rescission. To date, Cincinnati has not offered an explanation for its conduct or tried to show that it did not know of or recklessly disregard the 60-day notice provision. Thus, a reasonable jury could find that Cincinnati wrongly asserted rescission as a basis for denying coverage for the Farwell property loss.

Likewise, there is a genuine factual dispute as to whether Cincinnati had a reasonable basis to deny coverage based on the freeze exclusion. Cincinnati contends that because all Midwest needed to do to get the heat turned back on was pay the electric bill, it is obvious that Midwest did not use its "best efforts" to maintain the heat in

the Farwell property. However, Midwest has submitted evidence from which a reasonable jury could conclude that getting the heat turned back on was not simply a matter of paying the electric bill. This evidence shows that Midwest contacted the utility company as soon as it learned that the heat had been shut off and asked to have the power restored. The utility company refused to act until Midwest paid an outstanding bill on a different property, which the utility company had mailed to the wrong address. After Midwest paid the bill, the utility company waited several more days before sending a crew to the property to restore the power. But even then, the utility company could not restore the heat because the crew did not bring everything it needed to turn the electricity on. The utility company did not return to the property until several days later, and by then the pipes had frozen and caused the loss. If the jury finds both that the above facts are true and that Cincinnati knew that they were true or recklessly failed to investigate to determine whether they were true, then it could reasonably find Cincinnati liable for bad faith. Accordingly, Cincinnati's motion for summary judgment on the bad-faith claim will be denied.

**E.     Cincinnati's Request to Limit Damages to Midwest's Insurable Interest**

In its motion for summary judgment, Cincinnati contends that Midwest's claim for coverage under the policy should be limited to $533,948.00, which was the amount of its mortgage lien at the time of the loss. Cincinnati contends that the mortgage lien was Midwest's only insurable interest in the property, and that, for this reason, allowing it to collect more than the amount of the lien would conflict with a principle of insurance law providing that a party may not obtain insurance in the absence of an insurable interest.

Cincinnati cites no authority to support its assertion that Midwest's claim should be limited to the amount of its insurable interest at the time of the loss. Moreover, a Wisconsin statute provides that "[n]o insurance policy is invalid merely because the policyholder lacks insurable interest." Wis. Stat. § 631.07(4). Instead, if an insurer issues a policy to a person who lacks an insurable interest, the insurer is still liable to provide coverage under the policy, but the court may order the proceeds to be paid to someone other than the insured—*i.e.*, to the person who had the insurable interest in the subject of the policy. *See id.* Thus, even if Midwest did not have an insurable interest in the entire property at the time of the loss, Cincinnati's obligations under the policy would not be limited to the amount of Midwest's interest. Moreover, because no one besides Midwest has come forward to claim an interest in the Farwell property, Midwest is entitled to collect the full policy proceeds. *See Martin v. Tower Ins. Co.*, 119 Wis. 2d 48, 51 (Ct. App. 1984).

## F.    Alleged Violations of Wisconsin Insurance Statutes

Chapter 618 of the Wisconsin Statutes applies to nondomestic insurers and surplus-lines insurance. It contains various provisions that are intended to protect consumers who cannot obtain insurance from admitted insurers and who must therefore access the surplus-lines market. Midwest alleges that the defendants violated several provisions of this chapter while procuring the Cincinnati policy at issue in this suit. Midwest contends that, because of these violations, it is entitled to the relief specified in Wis. Stat. § 618.44. That statute provides as follows:

> An insurance contract entered into in violation of [Chapter 618] is unenforceable by, but enforceable against, the insurer. The terms of the contract are governed by chs. 600 to 646 and 655 and rules promulgated

thereunder. If the insurer does not pay a claim or loss payable under the contract, any person who assisted in the procurement of the contract is liable to the insured for the full amount of the claim or loss, if the person knew or should have known the contract was illegal.

Wis. Stat. § 618.44. Midwest has moved for summary judgment on its claims under this statute. The defendants have also moved for summary judgment on these claims.

Initially, I must discuss the nature of the two forms of relief available under § 618.44. First, the statute provides that an insurance contract entered into in violation of Chapter 618 is "unenforceable by, but enforceable against, the insurer." Midwest contends that this language means that, if statutory violations have occurred, then the insurer "cannot enforce the exclusions stated in the [policy]." Br. in Opp. at 11, ECF No. 94. However, Midwest's contention is not consistent with the plain meaning of the statutory language. The statute provides that, in the event of a violation, the "insurance contract" is enforceable by, but unenforceable against, the insurer. The exclusions are part of the "insurance contract," and the statute does not give the insured the right to remove the exclusions from the contract and enforce the remainder. Midwest seems to believe that anytime an insurer denies coverage based on an exclusion, it is "enforcing" the policy against the insured. However, while that may be a colloquial way to describe the insurer's conduct, it is not legally correct. An insurer "enforces" an insurance policy against the insured by collecting the policy premiums. *See Combined Investigative Servs., Inc. v. Scottsdale Ins. Co.*, 165 Wis. 2d 262, 272 (Ct. App. 1991) (noting that insured sought "a full refund of all its premiums" under § 618.44). Refusing to pay a claim is not enforcing the policy. It is the insured who seeks to enforce the policy by making a claim for benefits. When the insurer denies the claim based on a policy

exclusion, it is simply defending against the insured's claim, not prosecuting its own claim for enforcement of the contract. Thus, even if Midwest establishes that the insurance contract is illegal, Cincinnati may point to the freeze exclusion as a reason to deny the claim.

The other relief available under § 618.44 is stated in its third sentence: "If the insurer does not pay a claim or loss payable under the contract, any person who assisted in the procurement of the contract is liable to the insured for the full amount of the claim or loss, if the person knew or should have known the contract was illegal." This sentence is the basis for Midwest's claim against CSU Producer Resources and its remaining claims against the Marsh & McClennan Agency. That is, Midwest alleges that because various statutory violations were committed in connection with the Cincinnati policies, and because CSU Producer Resources and Marsh either knew or should have known that such violations were committed, both CSU Producer Resources and Marsh will be liable for the full amount of the Farwell property loss if Cincinnati does not pay.

Here, I note that there seems to be virtually no chance that Cincinnati will not pay a judgment entered against it in this case. Midwest has not suggested that Cincinnati is insolvent or that there is any other reason to think that Cincinnati will not pay if it is found liable. Nonetheless, until Cincinnati pays the claim or is found to have properly denied it, Midwest may continue to prosecute its claims against CSU Producer Resources and Marsh under § 618.44. Thus, I will address whether Midwest is entitled to summary judgment on its claims under § 618.44, and whether either CSU Producer Resources or Marsh is entitled to summary judgment on those claims.

### 1.    Surplus Lines Licensing

Midwest contends that the Cincinnati policy is illegal because the employees of Marsh and CSU producer resources who worked on procuring it were not licensed as surplus-lines agents or brokers in Wisconsin. Marsh's employee—Niestrom—was licensed as an agent or broker with respect to property and casualty insurance, but he did not hold a separate license for surplus-lines insurance. Likewise, the employee of CSU Producer Resources who performed the underwriting for the transaction—Thomas Berryman—was not licensed as a surplus-lines agent or broker. However, Scott Hintze of CSU Producer Resources was licensed as a surplus-lines broker in Wisconsin. After Niestrom and Berryman agreed on the policy for Midwest, the policy was formally placed with Cincinnati using Hintze's name and license number, which are listed on the policy's declarations page. *See* ECF No. 49-3 at  p. 2 of 467.

Midwest concedes that Hintze was properly licensed as a surplus-lines broker. However, it contends that this is irrelevant, since Hintze had no direct involvement with the negotiation and underwriting of the Cincinnati policy. In Midwest's view, Wisconsin law requires the individuals who actually negotiate and underwrite a surplus-lines policy to hold surplus-lines licenses.

The Wisconsin insurance code provides in relevant part that "[n]o natural person may perform, offer to perform, or advertise any service as an intermediary in this state, unless the natural person obtains a license under § 628.04." Wis. Stat. § 628.03(1). A person is an "intermediary" if the person "[s]olicits, negotiates or places insurance or annuities on behalf of an insurer or a person seeking insurance or annuities" or "[a]dvises other persons about insurance needs and coverages." *Id.* § 628.02(1).

Wisconsin Statute § 628.04 establishes several different types of insurance licenses. The licenses relevant to this case are the general license under § 628.04(1) and the surplus-lines license under § 628.04(2). Under the latter provision, a surplus-lines license may be issued to an applicant who shows that "in addition to the qualifications necessary to obtain a general license under [§ 628.04(1)], the applicant has the competence to deal with the problems of surplus lines insurance."

With one exception, no provision of the Wisconsin insurance code expressly forbids an insurance intermediary from soliciting, negotiating, underwriting, or obtaining surplus-lines insurance without a surplus-lines license. The exception appears in Wis. Stat. § 618.41(7m), which provides that "[a] natural person may not solicit, negotiate or obtain liability insurance for a risk purchasing group from an unauthorized insurer unless the natural person is licensed as a surplus lines agent." This exception does not apply here, because Midwest is not a risk purchasing group. Thus, Midwest is unable to point to a provision of Wisconsin law that required Niestrom and Berryman to hold surplus-lines licenses to perform their roles in the transaction.

Still, the Wisconsin insurance code clearly contemplates that surplus-lines insurance will be placed only through a licensed surplus-lines broker or agent. As discussed in the background section, above, states typically regulate surplus-lines insurers indirectly through brokers who are licensed by the state to place such insurance. *See* Congressional Research Service, *Surplus Lines Insurance: Background and Current Legislation* (July 22, 2010) (summary page) ("The sale of [surplus lines] insurance is regulated and taxed by the states largely through requirements placed on the brokers who usually facilitate the insurance transactions."); Kilbourn & Winn, 25 Tort

& Ins. L.J. at 304 ("Generally, brokers and agents who place surplus lines insurance are required to obtain a license or certificate pursuant to state law and regulations. The failure of a broker or agent to obtain such a license or certificate before placing insurance on behalf of an unauthorized insurer may result in fines, penalties, and in some instances, civil liability."). The Wisconsin insurance code fits the typical pattern. For example, the code forbids agents and brokers from placing insurance with surplus-lines insurers that are not financially sound and that engage in unfair practices unless they provide certain disclosures to the proposed insured. *See* Wis. Stat. § 618.41(8). Moreover, agents and brokers must collect the 3% tax imposed on surplus-lines policies and are jointly liable with the policyholder for payment of the tax. *See* Wis. Stat. § 618.43(1)–(2); Wis. Admin Code § INS 6.17(5).

Because the Wisconsin insurance code regulates surplus-lines insurance through agents and brokers, it is natural to interpret the code as requiring that a licensed surplus-lines intermediary be involved in the transaction. Several code provisions provide textual support for this licensing requirement. First, Wis. Stat. § 628.02(5) defines "surplus lines agent or broker" as "one licensed to place insurance with unauthorized insurers, under § 628.04(2)." Although this provision is just a definition, it clearly contemplates that surplus-lines insurance will be placed through licensed surplus-lines agents or brokers. Second, Wis. Stat. § 628.04(2) provides that a surplus-lines license "authorize[s]" an agent or broker "to place business under" the surplus-lines statute, § 618.41. This implies that a broker who does not hold a surplus-lines license may not place business with a surplus-lines insurer. Finally, the code's definition of surplus-lines insurance states that such insurance is "placed through a

surplus lines agent or broker" with an unauthorized insurer. Wis. Stat. § 618.40(10)(b). This may be the most direct statement of the licensing requirement, for unless a policy issued by an unauthorized insurer qualifies as surplus-lines insurance, it is an illegal policy. *See* Wis. Stat. § 618.41 (providing that insurer without a certificate of authority may issue insurance contracts on risks in the state only if it complies with the surplus-lines statute).

Based on the above statutory provisions, I conclude that surplus-lines insurance must be "placed" with an insurer through an agent or broker who holds a Wisconsin surplus-lines license. However, it does not follow that Niestrom and Berryman needed to hold surplus-lines licenses to perform their work on the Midwest policy. Niestrom and Berryman negotiated the policy, and then Berryman performed the underwriting. No provision of the Wisconsin insurance code requires a person to hold a surplus-lines license to perform these tasks (unless the policy is for a risk purchasing group, *see* Wis. Stat. § 618.41(7m), which in this case it was not). Instead, the code requires that a licensed surplus-lines agent or broker "place" the policy with the insurer.

In the present case, the policy was placed with Cincinnati using Scott Hintze's surplus-lines license. Although Hintze was not directly involved in the transaction, he consented to the use of his name and broker's license, as evidenced by the policy's declarations page. Perhaps Berryman performed the ministerial tasks that resulted in the insurance being placed with Cincinnati. However, Hintze supervised Berryman. The Wisconsin insurance code does not provide that a licensed surplus-lines broker may not rely on employees or agents to perform the acts that result in the insurance being placed with a surplus-lines insurer. Indeed, the purpose of requiring surplus-lines

insurance to be placed through a licensed broker seems to be to ensure that the broker conducts an investigation to determine that the insurer is financially sound and otherwise reputable, such that the insurer is likely to pay a covered loss should one occur. *See* Wis. Stat. § 618.41(8). A broker can perform this role with respect to a given insurer, such as Cincinnati, and then allow others to place policies with that insurer under the broker's license. Especially in this case, there would seem to be no reason to have Hintze involved in every transaction in which CSU Producer Resources placed a policy, for it placed policies exclusively with Cincinnati. Hintze would be familiar with the general financial condition and business practices of the only insurer with which CSU Producer Resources placed policies. He could therefore authorize the employees he supervised to place insurance with Cincinnati under his license.[5]

For these reasons, I conclude that Niestrom and Berryman did not need to hold Wisconsin surplus-lines licenses to perform their work on the Midwest policy. The policy was placed through a licensed surplus-lines broker and therefore was not illegally placed with an unauthorized insurer. Accordingly, Midwest's motion for summary

---

[5] Marsh's expert witness, William Way, testified that it is typical within the insurance industry to have "the boss" at a wholesale broker hold a surplus-lines license and have him or her "sign off" on the policies placed with the surplus-lines insurer by others at the brokerage. *See* ECF No. 85-1 at p. 13 of 29 (deposition p. 258). The fact that this practice is typical in the industry does not mean it is legal, but it does suggest that state insurance commissioners do not require that all intermediaries involved in a surplus-lines transaction be licensed as surplus-lines agents or brokers. Indeed, the defendants have produced an email from an employee of the Wisconsin Office of the Commissioner of Insurance in which the employee states that "certainly not every broker in the [surplus-lines brokerage] needs to have his/her own surplus lines authority." ECF No. 61-5. Rather, only "the head" of the brokerage must hold the surplus-lines license. *Id.*

judgment on this issue will be denied, and the defendants' cross-motions on the issue will be granted.[6]

## 2. Surplus Lines Proposal Letter

Midwest next contends that the Cincinnati policy is illegal because no defendant sent Midwest a surplus-lines proposal letter. Sending this letter is one of the requirements that must be fulfilled for a nonadmitted insurer to legally issue an insurance policy on a risk located in Wisconsin. *See* Wis. Stat. § 618.41(1) & (4). The Wisconsin insurance code states as follows:

> Information to policyholder. The insurer and any agent or broker are obligated promptly to furnish the policyholder a statement in a form prescribed or approved by the commissioner, informing the policyholder that the insurer has not obtained a certificate of authority to do business in this state and is not regulated in this state except as provided in this section.

Wis. Stat. § 618.41(4). The Wisconsin insurance commissioner has adopted a regulation to implement this provision. It provides that "[e]very licensed surplus lines agent who procures surplus lines insurance shall . . . [f]orward promptly to the policyholder a completed copy of a Surplus Lines Insurance Proposal in a form substantially as in Appendix 1 to this rule." Wis. Admin Code § INS 6.17(3)(a). The appendix consists of the following form letter:

> Dear _____:
>
> You have asked that I procure the following insurance coverage on your behalf: _____.
>
> I can procure the coverage desired from the following insurer(s) at the premium listed: _____.

---

[6] My conclusion that Niestrom and Berryman were not required to hold surplus-lines licenses also resolves Midwest's related claim that the property policy was illegal due to the payment of commissions to unlicensed intermediaries. *See* Wis. Stat. § 628.61(1).

> This insurance is with an insurer which has not obtained a certificate of authority to transact a regular insurance business in the state of Wisconsin, and will be issued and delivered as a surplus lines coverage pursuant to § 618.41, Stats. The insurance is regulated by the Commissioner of Insurance only as provided in §§ 618.41 and 618.43, Stats. Section 618.43 (1), Stats., requires payment by the policyholder of a 3% tax on gross premium (except for Ocean Marine Insurance on which the tax is one-half of 1%). The tax in this instance amounts to $_____.
>
> If the above transaction is not satisfactory, please advise immediately.

Wis. Admin. Code § INS 6.17 App. 1.

In the present case, no defendant sent Midwest a proposal statement that is identical to the form letter contained in the insurance regulation. However, the defendants note that the declarations page of the Cincinnati policy contained a "notice to policyholder" that included some of the information that must be part of the proposal statement. This notice was "stamped" on the policy as required by a separate provision of the insurance code, Wis. Stat. § 618.41(9).[7] The notice stated as follows:

> NOTICE TO POLICYHOLDER:
> This insurance contract is with an insurer which has not obtained a certificate of authority to transact regular insurance business in the state of Wisconsin, and is issued and delivered as a surplus line coverage pursuant to § 618.41 of the Wisconsin Statutes. Section 618.43(1), Wisconsin Statutes, requires payment by the policyholder of 3% tax on gross premium.

ECF No. 493- at p. 2 of 467. The defendants contend that this notice contained enough of the information specified in the commissioner's form letter to render it substantially similar to the form letter. Essentially, the defendants contend that their compliance with the "stamping" requirement of Wis. Stat. § 618.41(9) resulted in compliance with the

---

[7] Technically, the notice was printed on the declarations page, not stamped. But in the insurance industry, the notice is commonly referred to as a "stamp" because brokers used to literally stamp the notice on surplus-lines policies using a rubber stamp and red ink. *See* Report of William Way at 6, ECF No. 85-2.

"proposal" requirement of Wis. Stat. § 618.41(4). For the reasons stated below, I disagree.

First, the proposal requirement is distinct from the stamping requirement, and each disclosure must be made at a different time. The proposal letter must be "furnish[ed]" to the policyholder "promptly." Wis. Stat. § 618.41(4). The commissioner's form letter makes clear that this means before the policy has been procured, for it informs the insured that the agent or broker intends to procure the policy on a surplus-lines basis and instructs the insured to contact the agent or broker if the proposal is not satisfactory. In contrast, the information required to be stamped on the policy must be disclosed at the time the policy is "procured and delivered." *Id.* § 618.41(9). Thus, an insurer's or broker's compliance with the stamping requirement will not automatically result in compliance with the proposal requirement.

Second, both the statute and the commissioner's regulation require the proposal letter to include information that is not included in the stamped notice. Specifically, the statute and the regulation require the proposed insured to be informed that the insurer is not regulated by the state except as provided in Wis. Stat. § 618.41. This is important information, for it warns the proposed insured that the insurer is not subject to the same regulation as an admitted insurer, and that therefore there may be a higher risk of the insurer's failing to pay a covered claim. And this is information that the insured must receive *before* the policy is issued, so that the insured may decline to proceed with the transaction if it is unwilling to assume the higher risk. Thus, the stamp that appears on the policy's declarations page cannot serve as a proposal letter.

For these reasons, I conclude that the Cincinnati policy was issued in violation of Wis. Stat. § 618.41(4), which means that the policy is technically illegal and "unenforceable by, but enforceable against," Cincinnati. Wis. Stat. § 618.44. However, as discussed above, Midwest has elected to enforce the contract, and therefore the finding of illegality does not have much of an impact on Cincinnati.[8] However, if Marsh and CSU Producer Resources "knew or should have known the contract was illegal" because no proposal letter was sent, then they will be liable for paying Midwest's claim if Cincinnati does not pay. *Id.*

Here, I conclude that a genuine factual dispute exists over whether Marsh and CSU Producer Resources knew or should have known that no proposal letter was sent. Under the commissioner's regulation, it was CSU Producer Resources who was responsible for sending the proposal letter. This is so because the regulation requires the proposal to be sent by the "licensed surplus lines agent." Wis. Admin. Code § INS 6.17(3)(a). As discussed above, that was Hintze, who worked for CSU Producer Resources. However, prior to the transaction, CSU Producer Resources entered into a "producer agreement" with Marsh that essentially allowed Marsh to place policies with Cincinnati through CSU Producer Resources. *See* ECF No. 49-11. Under this

---

[8] The finding of illegality may render Cincinnati liable for attorneys' fees and punitive damages under Wis. Stat. § 618.48, which allows punitive damages and attorneys' fees against an insurer who issued an illegal policy and who does not pay a covered claim within 30 days without reasonable cause. However, Cincinnati is already exposed to such liability in connection with Midwest's bad-faith claim. *See Water Well Solutions v. Consol Ins. Co.*, 369 Wis. 2d 607, 633 (2016); *DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 571 (1996). It is difficult to conceive of a circumstance in which Cincinnati could be found to have lacked reasonable cause to deny the claim and not be liable for bad faith. So again, the finding of illegality does not have much of an impact on Cincinnati.

agreement, Marsh agreed to "ensure compliance with various State laws requiring notice to a proposed insured, before coverage is placed by [CSU Producer Resources], that coverage will be provided by an insurer not licensed in that State and that, in the event of insolvency, the payment of loss may not be guaranteed." *Id.* ¶ 14. Thus, as between Marsh and CSU Producer Resources, it was Marsh that should have sent the proposal letter to Midwest.

Of course, the producer agreement could not relieve Hintze and CSU Producer Resources of their responsibilities under state law. So Marsh's failure to send Midwest the proposal letter exposed Hintze to the possibility that the insurance commissioner would impose forfeitures or penalties on him or revoke his surplus-lines license. *See* Wis. Admin. Code § INS 6.17(6). But the question at hand is not whether any specific person violated Wisconsin law by failing to send the surplus-lines proposal letter. The question is whether either Marsh or CSU Producer Resources "knew or should have known" that the proposal letter was not sent. Wis. Stat. § 618.44. The record does not contain evidence showing that anyone at CSU Producer Resources knew that Marsh did not send the proposal letter to Midwest. Although it is arguable that CSU Producer Resources should have kept tabs on Marsh to ensure that it sent the letter, I cannot say that a reasonable jury would be *compelled* to find that CSU Producer Resources should have known that Marsh did not send the letter.

Likewise, there is a genuine dispute of fact as to whether Marsh knew or should have known that the letter was not sent. Although the producer agreement placed the burden to send the letter on Marsh, there is no evidence that Niestrom or anyone else at Marsh was aware of that fact during the negotiation of the policy. Again, it is arguable

34

that Marsh should have known that CSU Producer Resources was relying on it to send the proposal letter, but a reasonable jury would not be compelled to accept this argument. Thus, no party is entitled to summary judgment on the question of whether Marsh and CSU Producer Resources knew or should have known that the policy was illegal due to the failure to send the surplus-lines proposal letter.

### 3.    Managing General Agent

Midwest next contends that CSU Producer Resources acted as a "managing general agent" for Cincinnati without holding a license to do so, as required by Wis. Stat. § 628.04(5) and its implementing regulations. A managing general agent is a type of agent or broker that performs functions ordinarily handled by the insurer itself, such as underwriting, binding coverage, and adjusting claims. *See* Wis. Stat. § 628.02(4g); https://www.irmi.com/term/insurance-definitions/managing-general-agent (last viewed July 11, 2019).

The parties dispute whether CSU Producer Resources was Cincinnati's managing general agent. However, even if it was, the lack of a license could not result in a finding of policy illegality under § 618.44. The latter statutory provision applies only to insurance contracts entered into in violation of Chapter 618 of the Wisconsin Statutes—the chapter that governs surplus-lines insurers and other nonadmitted or unauthorized insurers. The requirement that all managing general agents be licensed is not found in Chapter 618; it is found in Chapter 628. Moreover, no provision of Chapter 618 prohibits unlicensed managing general agents from participating in surplus-lines transactions. Rather, as discussed above, so long as the broker who places the policy holds a surplus-lines license, the licensing requirements for surplus-lines transactions

will be satisfied. Thus, even if Midwest proves that CSU Producer Resources acted as Cincinnati's managing general agent without a license, it would not be entitled to relief in this case.

In any event, CSU Producer Resources was not required to hold a license to act as Cincinnati's managing general agent. The Wisconsin Statutes do not expressly require managing general agents to be licensed. Rather, they authorize the commissioner of insurance to adopt rules requiring managing general agents to be licensed. *See* Wis. Stat. § 628.04(5). The commissioner has adopted such a rule, which states in relevant part that "[n]o person, including, but not limited to, a natural person, may act as a managing general agent *for an insurer* with respect to a risk located in this state unless the person is licensed as a managing general agent." *See* Wis. Admin Code § INS 42.02 (emphasis added). The commissioner has defined the word "insurer" in a way that excludes surplus-lines insurers such as Cincinnati. That definition provides that an "insurer" is an entity "which has a certificate of authority under ch. 611, 612, 613, 614 or 618, Stats." *Id.* § INS 42.01(2). But Cincinnati is a surplus-lines insurer doing business in Wisconsin *without* a certificate of authority. *See* Pl. Prop. Findings of Fact ¶ 22, ECF No. 47. So even if CSU Producer Resources acted as a managing general agent for Cincinnati, it did not act as a managing general agent "for an insurer." Therefore, it was not subject to the licensing requirement of Wis. Admin. Code § INS 42.02(1).

For these reasons, Midwest's motion for summary judgment on this issue will be denied, and the defendants' cross-motions will be granted.

### 4. Misrepresentation of Broker Status

Under Wis. Stat. § 628.34(1)(a), it is unlawful to communicate "false or misleading information" with respect to an insurance transaction. Midwest contends that CSU Producer Resources violated this provision by referring to itself as a "broker" on the declarations page of the Cincinnati policies. Midwest's argument is based on the definition of "broker" in the Wisconsin Statutes, which provides that "[a]n intermediary is an insurance broker if the intermediary acts in the procuring of insurance on behalf of an applicant for insurance or an insured, and does not act on behalf of the insurer except by collecting premiums or performing other ministerial acts." Wis. Stat. § 628.02(3). Midwest contends that CSU Producer Resources was not a broker under this definition because it performed various non-ministerial acts for Cincinnati, including underwriting and binding policies.

However, the declarations page does not state that CSU Producer Resources was Midwest's broker as defined in the Wisconsin Statutes. Rather, it simply lists CSU Producer Resources next to the word "broker." *See* ECF No. 49-3 at p. 2 of 467. In the insurance industry, it would not be false or misleading to refer to CSU Producer Resources as a broker. Technically, a broker is a person who represents the insured in an insurance transaction, and an agent is a person who represents the insurer. *See* Billy L. Akin, *What Attorneys Need to Know About Insurance*, 45 Tenn. B.J. 22, 23 (2009). "In actual practice," however, "the distinction between broker and agent has been blurred, and both terms are used for those entities procuring coverage." *Id.* Indeed, an entity, like CSU Producer Resources, who places insurance with a surplus-lines carrier is commonly described as a "wholesale broker" or a "surplus lines broker."

37

*See Crusader Ins. Co. v. Harry W. Gorst Co.*, 2016 WL 1494110, at *1; www.irmi.com/term/insurance-definitions/wholesale-broker (last viewed July 11, 2019). Likewise, companies such as Marsh who are technically brokers because they represent insureds are often referred to as "agents" or "agencies," even though those terms technically mean entities that work for the insurer. *See* Dep. of William Way at 262, ECF No. 85-1 at p. 17 of 29. Thus, under ordinary usage—as opposed to the usage in the Wisconsin Statutes—CSU Producer Resources could accurately refer to itself as a "broker." And because nothing in the context of the declarations page suggests that the term "broker" was being used as defined in Wis. Stat. § 628.02(3), CSU Producer Resources did not, in using the term, communicate false or misleading information. Accordingly, Midwest's motion for summary judgment on this issue will be denied, and the defendants' cross motions will be granted.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the parties' motions for summary judgment (ECF Nos. 46, 71, 76 & 80) are **GRANTED IN PART** and **DENIED IN PART**, as follows: Summary judgment is entered in favor of Midwest and Marsh on Cincinnati's claim for rescission; summary judgment is entered in favor of Marsh on Midwest's claim for negligence; and summary judgment is entered in favor of the defendants on Midwest's claims under Wis. Stat. § 618.44 based on the lack of surplus-lines licenses, managing general agent status, payment of commissions, and communication of false or misleading information. In all other respects, the motions are denied.

**IT IS FURTHER ORDERED** that Midwest's motion for leave to file a brief exceeding the page limit (ECF No. 93) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 12th day of July, 2019.

<div align="center" style="margin-left:50%">

s/Lynn Adelman
LYNN ADELMAN
United States District Judge

</div>